# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5488-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.H.,

    Defendant,

and

D.L.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.P.D.,

    a Minor.

_____

Submitted April 20, 2020 – Decided June 5, 2020

Before Judges Ostrer, Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0150-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Christopher Anthony Huling, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Juliana L. Stiles, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Linda Vele Alexander, Designated Counsel, on the brief).

PER CURIAM

Defendant D.L. (David)[1] appeals from a Family Part order terminating his parental rights to his daughter, A.P.D. (Ann). David contends the court erred by finding the New Jersey Division of Child Protection and Permanency (Division) sustained its burden of presenting clear and convincing evidence establishing each prong of the statutory best interests of the child standard, N.J.S.A. 30:4C-15.1(a). Having reviewed the record and applicable law in light

---

[1] We use initials and pseudonyms to identify the parties, the child, and their family members because records related to New Jersey Division of Child Protection and Permanency proceedings held pursuant to Rule 5:12 are excluded from public access under Rule 1:38-3(d)(12).

of the arguments advanced on appeal, we are convinced the court correctly determined the Division satisfied its burden, and we affirm the court's order terminating David's parental rights.

I.

Prior to Ann's birth in July 2017, Ann's mother, defendant A.H. (Alice), had three other children, none of whom were in her custody.[2] On the day after Ann's birth, the Division received a referral that Alice and Ann tested positive for marijuana. Alice identified P.D. (Paul) as Ann's father. Paul took Ann home from the hospital subject to a Division safety plan barring Alice from any unsupervised contact with Ann.

---

[2] Alice did not respond to the guardianship complaint or participate in the trial. The court entered default against Alice in accordance with Rule 4:43-1; made detailed findings concerning Alice following the guardianship trial; and determined the Division presented clear and convincing evidence satisfying each prong of the best interests of the child standard. See N.J.S.A. 30:4C-15.1(a). The court ordered the termination of Alice's parental rights, and Alice does not appeal from the court's order. It is therefore unnecessary to detail the facts and circumstances establishing the numerous bases supporting the termination of Alice's parental rights to Ann.

A-5488-18T3

In December 2017, genetic testing revealed Paul is not Ann's father. The Division conducted a Dodd removal [3] and placed Ann in a non-relative resource home. Alice later identified T.K. as Ann's father, but a February 2018 genetic test established otherwise.

Alice also identified David as Ann's putative father. In April 2018, a genetic test established David's paternity, and the Division immediately arranged an initial visit between David, his family members, and Ann. After the initial visit, David informed the Division he was on probation, had violated the conditions of his probation, and was to be incarcerated in State prison. David was on probation following his release from incarceration in December 2017, and he had violated the conditions of his probation by committing an aggravated assault on his fiancée, S.B. David reported he had resided with S.B. and her two minor daughters in S.B.'s home since 2013, during the times he was not incarcerated.

David pleaded guilty to the aggravated assault of S.B. pursuant to a plea agreement, and, at the time of his initial visit with Ann, he was awaiting

---

[3] A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.29, a provision included within the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

sentencing to a maximum three-year custodial term. The Division arranged three additional visits with David, Ann, and members of David's family prior to the commencement of David's three-year custodial sentence on June 15, 2018. The Division maintained records of each person present during the visits with Ann, and the records show S.B. did not attend any of the visits with the child. David remained incarcerated through the completion of the guardianship trial in August 2019, with an anticipated release date in late 2019.

Prior to his incarceration in 2018, David requested the court place Ann with his mother, N.A., but the Division ruled out N.A. because she failed a drug screen and had a prior history with the Division. The Division also ruled out Ann's maternal aunt, V.H., who had custody of two of Alice's older children, because V.H. tested positive for marijuana and alcohol.[4]

In October 2018, Ann's resource parents decided they could no longer care for her. Ann was placed in another resource home, but she suffered physical injuries and bruises during her short stay there. The Division placed Ann with her paternal great aunt, C.H. (Clara), who had cared for David during the first eight years of his life. Prior to Ann's placement with Clara, the Division facilitated visits with Ann by David's family, including his mother, N.A., and

---

[4] The Division referred V.H. for treatment.

Clara. Following a November 2018 Family Part court proceeding, David told the Division caseworker he was "happy that his daughter [was] in his aunt's care."

Two months later, the Division filed a guardianship complaint. During a February 19, 2019 court hearing, the Division advised the court it scheduled psychological and bonding evaluations for David in April 2019. The court noted David participated in New Jersey Department of Corrections' services while incarcerated. David explained he obtained a general equivalency diploma, completed a "parenting program," and was participating in Narcotics Anonymous and Alcoholics Anonymous.

David advised the court he was incarcerated at Southern State Prison, which permitted visitation only on Saturdays and Sundays. He said the prison had "a place where the kids can play . . . and bond with their dads and everything like that." In response to the court's questions, David explained he had not had visitation with Ann since his June 2018 incarceration. Counsel for the Division advised the court the Division did not have staff supporting prison visitation on weekends.

The court expressed concern David might not have visitation with Ann prior to the scheduled psychological and bonding evaluations and suggested

6

future court proceedings be utilized for David to visit with Ann. The court noted Clara "was nice enough to . . . bring [Ann]" to the court proceeding "for [David] to visit with his daughter," and it arranged for David to visit with Ann at the courthouse after the proceeding ended. The court scheduled two additional case management conferences prior to the psychological and bonding evaluations, noted Clara agreed to bring Ann to the court on those days, and explained David would be permitted to visit with Ann while at the courthouse on those days because arranging visitation with David at Southern State Prison on the weekends was "really difficult, if not impossible."

Although the court arranged for David to visit with Ann at the scheduled court appearances, David chose not to appear at the following case management conference. He declined the opportunity to get on a Department of Corrections bus to travel to the court for the scheduled case management conference and visitation with Ann. The court noted Clara brought Ann to the court for the visitation and advised Clara she was not required to attend or bring Ann to subsequent case management conferences unless David advised his attorney in advance he would attend. Clara advised the court she would be unable to attend the next case management conference, which was scheduled for April 18, 2019, because she would be away in Canada with Ann.

A-5488-18T3

David appeared at the April 18, 2019 case management conference. The court explained Clara had been excused from attending the conference with Ann because David failed to appear at the previous conference. David's counsel asserted David opted not to attend the previous conference because David's removal from the prison to attend the conference would have resulted in a change in David's prison assignment from the "Farm" to general population.

The guardianship trial took place over four days. Clara testified concerning her care of Ann, her interest in adopting Ann, and Ann's progress and development. Clara kept pictures of David in her home and identified him to Ann as her "daddy." Clara has a close relationship with David's mother, N.A., as well as his grandmother and other great aunt, and they often visit Ann at Clara's home. Clara also cares for Ann's younger half-sister, D.L., who was four months old at the time of trial. Clara explained she planned to support a relationship between David and Ann. She also testified that during the time she cared for Ann, David never contacted her to inquire about, or check on, Ann.

A Division case worker testified about her visits with Ann at Clara's home, and she described Ann's interest in toys, Sesame Street, and going outside. She stated Ann "is doing great," and she explained Clara includes N.A. and other members of David's family in Ann's life. The case worker also testified Clara

8

meets all of Ann's needs, and she is "very protective" of, and "an advocate for," Ann.

Dr. Linda Jeffrey was qualified as an expert in the areas of clinical and forensic psychology and the treatment of alcohol and other psychoactive substance abuse disorders. She conducted a two-day psychological evaluation of David, a bonding evaluation of David and Ann, and a bonding evaluation of Clara and Ann.

Dr. Jeffrey explained David had a history of physical fighting with his paramours and problems with "non-violent conflict resolution." His criminal history includes two convictions for terroristic threats against separate former paramours, conspiracy, and the aggravated assault of S.B. David reported being unemployed for three years prior to his incarceration, and his housing plan following his incarceration was to reside with S.B. and her two daughters. He acknowledged his name was not on the lease for S.B.'s residence.

David told Dr. Jeffrey he intended for S.B. to function as Ann's "mother figure." David had never provided the Division with S.B.'s contact information, and he had not offered S.B.'s name as a putative placement for Ann during his incarceration. According to David, S.B. did not complete Division forms or supply information to the Division about being a placement due to her "extensive

work schedule." The Division caseworker testified S.B. had never requested visits with Ann.

Dr. Jeffrey detailed the numerous tests she performed during David's psychological evaluation. Based on the test results and information David provided, she concluded there was a high probability he had a substance abuse disorder. She further opined the tests showed that David had an "inflated sense of self" and a "very strong finding of narcissism," and that he may "lack[] personal insight and . . . show anger if confronted." Dr. Jeffrey testified the results revealed David has "little insight about his own limitations" and would "give little attention to the consequences of his behavior for other people."

Dr. Jeffrey offered diagnostic impressions of David, including narcissistic personality disorder with antisocial and borderline features, parent-child relational issues, chronic and severe adjustment disorder, major depressive disorder, and substance abuse related disorders. She testified David "has numerous and significant unresolved issues, both adjustment issues and difficulties with self and mood regulation, . . . as well as significant problems with rule[-]governed behavior." She noted David's "problems with rule governed behavior . . . also include emotional immaturity and unstable relationships," and "his clinical profile [is] very problematic for the capacities

that are necessary for parenting, which focus very much on such issues as insight, empathy, [and] parenting judgment."

Dr. Jeffrey concluded David "was not prepared to provide a minimal level of safe parenting," and he would be unable to safely parent Ann in the foreseeable future following his release from incarceration. She opined Ann "would be at risk for harm if she were placed in [David's] care," including risks "in terms of [her] physical environment . . . [and] psychological environment," because David's psychological issues rendered him unable to safely parent.

Dr. Jeffrey also testified concerning her bonding evaluation of David and Ann. She explained David said he did not have any visitation with Ann at the prison after his incarceration, and "he did not think . . . children should be brought to a place of incarceration for visitation." After observing David and Ann interacting during the evaluation, Dr. Jeffrey concluded Ann had no psychological attachment to David and "[s]he related to him as a pleasant visitor for a period of time and then she wanted to go." Dr. Jeffrey concluded severing Ann's relationship with David would not place Ann at risk of harm because "[t]here isn't a relationship there."

Dr. Jeffrey also detailed her bonding evaluation of Clara and Ann. She described the interactions between Clara and Ann and concluded Ann "is

11

securely attached to" Clara. Dr. Jeffrey testified Ann has an "affectionate tie" to, and "love relationship" with, Clara, and Ann responded to Clara's "guidance and . . . nurturing" as a "secure base, as a source of her basic trust, and as her source of comfort and safety." Dr. Jeffrey opined Ann has a secure attachment to Clara that "is of . . . profound psychological importance" because it "is the basis of a child's mental health," "has tremendous consequences for how a person develop[s]," and is "a very fundamental and . . . important part of normal development."

According to Dr. Jeffrey, severing Ann's relationship with Clara "would, in all likelihood, be a very serious emotional blow to" Ann. Dr. Jeffrey noted "[t]here is really nothing else that matches the severance of a secure attachment in terms of risk of harm to a child emotionally and psychologically." Dr. Jeffrey testified severing a secure attachment "pulls the rug out from underneath the child in the deepest and most destructive way."

Dr. Jeffrey concluded that severing two-year-old Ann's relationship with Clara placed Ann at risk for "derail[ed] development," behavioral issues, and "serious, serious trauma." Dr. Jeffrey determined further delay in providing Ann with permanency would also affect Ann's "ability to learn to manage emotional

arousal, anger, and [her ability] to engage in self-control" because "the first three years [are] the critical period of development."

David testified on his own behalf. He described first learning he is Ann's father and his first visit with her and his family members. He initially planned to have Ann stay at his mother's home while he was incarcerated, but the Division determined N.A.'s home was too small for the number of people living in it at the time. He acknowledged not offering the Division any other possible placements.

David also testified that following Ann's placement with Clara, he was not able to speak with Ann from prison, and he never tried writing Clara letters she could share with Ann. David testified he did not write letters because he was focusing on "the main things [he] needed to do to try to come home and care for" Ann. He said he completed prison "programs," including parenting classes, and he would "continue to do anger management programs."

Following his release from incarceration, David planned to obtain employment and reside with Ann, S.B., and her two daughters in S.B.'s home. He testified that, during his incarceration, S.B. attempted to contact Ann, but Clara would not let S.B. visit Ann. He intends to rely on his mother and other family members to assist in parenting Ann. He also testified his mother used

13

marijuana to address health issues but had not been prescribed medical marijuana.

David acknowledged he was incarcerated as the result of an altercation with S.B., and that he pleaded guilty to aggravated assault by causing bodily injury to S.B. However, he claimed "[t]here weren't any physical injuries done" and he had no "physical altercation with" S.B. He admitted he had two prior criminal convictions for terroristic threats of different "ex-girlfriends," and he was incarcerated for violating his probation by committing the aggravated assault on S.B., failing to complete anger management training, testing positive for marijuana, and failing to report to probation as required. David agreed he was first sentenced to probation in 2012 and "never successfully completed that probation or any other term of probation."

David explained he failed to attend a Family Part court session that, in part, had been arranged to allow visitation with Ann. He testified he did not attend because of "transportation," and that, due to issues in the prison, "you might not get woken up on time and the van will leave you." He testified he did not travel to court for the visitation because he "would've lost [his] status[,]" but he also stated he would not have lost his "status" if he attended a "family court

hearing[]."  David agreed Ann is "well cared for" by Clara, and Clara is "absolutely" doing "a good job with" Ann.

In an opinion issued from the bench, the court found Clara, Dr. Jeffrey, and the Division caseworker testified credibly and portions of defendant's testimony were not credible.  In its detailed and thorough opinion, the court found the Division presented clear and convincing evidence satisfying each prong of the best interests of the child standard and entered an order terminating David's parental rights to Ann.  This appeal followed.

II.

Our scope of review on appeal from an order terminating parental rights is limited.  N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).  We will uphold a trial judge's fact-findings if they are "supported by adequate, substantial, and credible evidence."  N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).  No deference is given to the court's "interpretation of the law," which is reviewed de novo.  D.W. v. R.W., 212 N.J. 232, 245-46 (2012) (first citing N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010), then citing Balsamides v. Protameen Chems., 160 N.J. 352, 372 (1999)).

15

"We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006) (citing Cesare, 154 N.J. at 411-13).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

David argues the court's findings under the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are not supported by substantial credible evidence and the court erred by finding the Division presented clear and convincing evidence satisfying each prong of the statutory standard. After reviewing these arguments in light of the record and applicable legal principles, we are not persuaded. We address the four statutory prongs in turn.

A-5488-18T3

## A.

The first prong of the best interests of the child standard requires clear and convincing evidence "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]"  N.J.S.A. 30:4C-15.1(a)(1).  "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'"  N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352).

The harm need not be physical, as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights."  In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)).  The focus of the harm is not on any isolated incident, but rather "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development."  K.H.O., 161 N.J. at 348.  "Moreover, '[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.'"  Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015) (alteration in original) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)).

The harm may be established by "a delay in establishing a stable and permanent home . . . ." D.M.H., 161 N.J. at 383. "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379 (citing K.H.O., 161 N.J. at 352-54). Additionally, a parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child] . . . constitutes a parental harm to that child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C-15.1(a)(1) and (2)." Id. at 380-81.

We reject David's claim the court did not make sufficient findings supporting its conclusion the Division proved Ann's safety, health, or development has been or will continue to be endangered by the parental relationship. N.J.S.A. 30:4C-15.1(a)(1). We also are unpersuaded by David's argument "it must be inferred from the [court's] decision that [it] determined [David's] incarceration constituted harm to" Ann. Both arguments are undermined by the record.

The court's decision is replete with references to the evidence establishing David's relationship with Ann has caused, and will continue to cause, Ann harm. The court further expressly addressed David's incarceration and made clear

A-5488-18T3

issues related to his incarceration constituted only a part of the circumstances supporting its conclusion his relationship with Ann has caused, and will continue to present a risk of, harm to Ann.

Our Supreme Court has explained that "incarceration alone–without particularized evidence of how a parent's incarceration affects each prong of the best interests of the child standard–is an insufficient basis for terminating parental rights." R.G., 217 N.J. at 556. "[I]ncarceration is a relevant factor in resolving termination of parental rights cases," id. at 555, but "it is by no means settled or obvious that incarceration is so inimical to [the parental] relationship as to justify its termination as a matter of law," ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 137 (1993)).

In R.G., the Court required consideration of the following factors in the assessment of incarceration as a factor in determining whether to terminate a defendant's parental rights:

> [P]erformance as a parent before incarceration, [and] to what extent his children were able to rely on him as a parent;
>
> [W]hat effort, if any, he has made to remain in contact with his children since his incarceration;
>
> [W]hether [the parent] will be able to communicate and visit with his children;

[W]hat effect such communications and visitation will have on the children in terms of fulfilling the parental responsibility to provide nurture and emotional support, to offer guidance, advice, and instruction, and to maintain an emotional relationship with his children;

[T]he risk posed to his children by [the parent]'s criminal disposition;

[W]hat rehabilitation, if any, has been accomplished since [the parent]'s incarceration[,] and the bearing of those factors on the parent-child relationship;

[W]ith the aid of expert opinion, . . . the need of the children for permanency and stability and whether continuation of the parent-child relationship with [the parent] will undermine that need; and

[T]he effect that the continuation of the parent-child relationship will have on the psychological and emotional well-being of the children.

[217 N.J. at 555-56 (quoting L.A.S., 134 N.J. at 143-44).]

Here, the court considered each of the factors identified in R.G. in its assessment of David's incarceration as one of the many circumstances pertinent to its decision to terminate his parental rights. The court made findings concerning David's involvement with Ann prior to his incarceration; his lack of any attempt or effort to stay in contact with Clara and Ann during his incarceration; his decision not to travel to the court to visit with Ann when that opportunity was presented; the nature of the crime for which David was

incarcerated—an aggravated assault of S.B. committed at the home she shared with her two daughters and at which he asserted he intended to live with Ann; David's efforts at rehabilitation while in prison; and Dr. Jeffrey's testimony concerning David's inability to safely parent Ann, Ann's need for permanency, and the manner in which continuation of her relationship with David will cause Ann emotional and psychological trauma and harm.

More particularly, the court accepted Dr. Jeffrey's unrefuted expert testimony that, independent of any issues related to David's incarceration and based on his psychological disorders, David "is not now or in the foreseeable future able to provide a minimal level of safe parenting of his two-year-old daughter [Ann] and that she would be at harm if placed in his care now or in the foreseeable future." The court also accepted Dr. Jeffrey's testimony David's inability to safely care for Ann would further delay the permanency that is "critical to her neurological, psychological, emotional, [and] educational development." See L.A.S., 134 N.J. at 144 (explaining a factor relevant to determining whether an incarcerated parent's parental rights should be terminated includes consideration of expert testimony about the child's need "for permanency and stability and whether continuation of the parent-child relationship with [the parent] will undermine that need").

A-5488-18T3

The court also considered and rejected David's claim that proof of his parenting skills was established by the time he spent living with S.B. and caring for her two daughters prior to his incarceration. The court found the claim was not credible and was belied by evidence showing that while David was purportedly residing with S.B. and parenting her two daughters, he was convicted of terroristic threats of another paramour by threatening her with violence; had a separate conviction for conspiracy to commit theft; and committed an aggravated assault upon S.B. at S.B.'s home. The court further noted the evidence showed that, during the same time David alleged he lived with S.B. and her two young daughters, David violated his probation by committing new crimes, failing to complete anger management classes, failing to report for probation, and testing positive for marijuana. The court found those actions and failures were consistent with Dr. Jeffrey's determination David suffered from "characterological deficits" and "a lack of emotional maturity and inability to place the child's needs above [his] own."

Contrary to David's claim, the court did not rely on the fact he was incarcerated as a basis for its decision to terminate his parental rights. Instead, the court properly considered David's incarceration only "as a relevant factor," see R.G. at 555, and it did so while also assessing the factors established in R.G.,

see id. at 555-56. Thus, the court's analysis and findings were properly "based on a broad inquiry into all the circumstances bearing on incarceration and criminality." L.A.S., 134 N.J. at 143. Each of the court's findings are supported by substantial credible evidence, and we discern no basis to upset them.

David also claims the court erred in its assessment of the factors because this case presents circumstances similar to those presented in R.G., where the Court determined the defendant's incarceration alone did not support a termination of his of parental rights. 217 N.J. at 559-65. As the motion court found, David stands in shoes different than those worn by R.G. In R.G., the defendant "called and wrote" to his child during his incarceration, id. at 560, but here, while David routinely called and spoke with his mother and S.B. while in prison, he never made any effort to communicate with Clara or speak with Ann while he was incarcerated. See L.A.S., 134 N.J. at 143-44 (explaining evaluation of harm to a child requires consideration of a parent's conduct prior to and during incarceration).

Moreover, in R.G., the Court found there was no evidence the crime for which the defendant was convicted "directly bore" on the defendant's ability to parent. 217 N.J. at 560. That is not the case here. As noted, the court found defendant's aggravated assault on S.B. and commission of other criminal

offenses and violations of probation while he resided with S.B. and her two daughters were consistent with certain psychological deficits and issues Dr. Jeffrey believes rendered David unable to safely parent Ann at the time of trial and in the foreseeable future. There is no indication in the Court's opinion the defendant in R.G. presented any similar circumstances bearing on his ability to safely parent his child.

Thus, contrary to David's contention, the court's decision included a detailed summary and analysis of the testimony and evidence supporting its findings under the first prong of the best interests standard, and our own independent review of the record reveals the findings are supported by substantial credible evidence. The court correctly concluded the Division sustained its burden under the first prong of the best interests of the child standard.

## B.

"The second prong, in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. The focus is on parental unfitness. K.H.O., 161 N.J. at 352; D.M.H., 161 N.J. at 378-79. In considering this prong, the court should determine whether it is reasonably foreseeable that the parent can cease

to inflict harm upon the child.  <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 607 (1986).

Under the second prong, parental unfitness can be demonstrated in two ways.  <u>K.H.O.</u>, 161 N.J. at 352.  First, a party can show that it is reasonably foreseeable that the parents will not or cannot cease to inflict harm upon the child.  <u>A.W.</u>, 103 N.J. at 607, 615-16.  This can be established by proving "parental dereliction and irresponsibility," which can be shown by proof of continued substance abuse, the inability to provide a stable home, and the withholding of nurturing and attention.  <u>K.H.O.</u>, 161 N.J. at 353.

The other manner of establishing the second prong is by demonstrating that removing the child from his or her resource placement would cause serious and enduring mental or emotional impairment.  N.J.S.A. 30:4C-15.1(a)(2). Under this alternative, a trial court examines the bonds between a child and his or her resource parent(s).  <u>See</u> <u>D.M.H.</u>, 161 N.J. at 382 (finding the second prong from N.J.S.A. 30:4C-15.1(a) was established partly based upon the court-appointed expert's determination that "breaking the children's bond with their foster family would cause substantial and enduring harm to the children").  The Court has held "[p]rong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption

of [the] bond with foster parents.'" F.M., 211 N.J. at 451 (alteration in original) (quoting K.H.O., 161 N.J. at 363).

David argues the court ignored his commitment to Ann during the short period after he learned he was her father and prior to his incarceration. He also notes he attempted to obtain a placement of Ann with his mother; he completed anger management classes and a parenting class in prison; he obtained his general equivalency diploma; and he made arrangements for employment and a residence with S.B. following his release from prison. He argues the court ignored such evidence in concluding he is either unable or unwilling to safely parent Ann.

Based on our review of the record, there is substantial credible evidence supporting the court's finding the Division sustained its burden under the second prong of the best interests standard. Dr. Jeffrey's unrefuted testimony established that severing Ann's relationship with Clara will cause Ann substantial and enduring psychological, emotional, and developmental harm. See D.M.H., 161 N.J. at 382; see also J.C., 129 N.J. at 19 (explaining the Division's proof in termination proceedings "should include the testimony of a well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster

parent"). The court properly relied on that competent expert testimony to determine harm will result if Ann's relationship with Clara is terminated and she is reunified with David. Ibid.

In addition, the Division's evidence further supports a finding David will be unable in the reasonably foreseeable future to cease inflicting harm upon the child. A.W., 103 N.J. at 607. Again, Dr. Jeffrey's testimony established David's numerous psychological issues rendered him unable to safely parent Ann. Where, as here, a parent is incapable of safely parenting a child and providing a safe and secure home, "the issue becomes whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth and Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001). Dr. Jeffrey's testimony established David was not capable in the foreseeable future of safely parenting Ann and any further delay in providing permanency will cause Ann significant and lasting harm. Dr. Jeffrey's testimony was unchallenged and uncontradicted. It provided ample support for the court's determination the Division proved the second prong of the best interests standard.

C.

Under prong three, the trial court must consider whether "[t]he [D]ivision . . . made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home . . . ." N.J.S.A. 30:4C-15.1(a)(3). The Division's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. D.M.H., 161 N.J. at 390.

N.J.S.A. 30:4C-15.1(c) defines "reasonable efforts" as those "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" The statute provides examples of "reasonable attempts," including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

We have previously recognized that reasonable efforts "vary depending upon the circumstances of the removal." N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007) (citing A.G., 344 N.J. Super. at 437). The Division's success regarding this prong is not measured by the parent's participation in the necessary services. D.M.H., 161 N.J. at 393. "[E]ven [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452.

The court's finding the Division made reasonable efforts to provide the services supporting David's reunification with Ann is supported by the evidence. The Division worked directly with Alice to determine the identity of Ann's father. Upon learning David was Ann's father, the Division immediately offered weekly visitation with David and his family that ended only because of David's incarceration. During his incarceration, the Division continued to provide visitation with Ann for David's mother and his other family members. David's argument the Division failed to arrange for visits with Ann at the prison is undermined by his statement to Dr. Jeffrey that he "did not think . . . children should be brought to a place of incarceration for visitation." When evidence established the prison visitation schedule, transportation issues, Division staffing issues, and Clara's unavailability to transport Ann to the prison made

A-5488-18T3

visitation at the prison impracticable, the court arranged for visitation between David and Ann at the courthouse, but David chose not to appear. David also routinely phoned his mother and S.B., but he opted to never contact Clara, his great aunt, to speak with or ask about Ann.

The Division monitored David's participation in programs available in the prison, including obtaining his general equivalency diploma, completing parenting and anger management classes, and attending a substance abuse program. The Division also provided psychological and bonding evaluations. Moreover, the Division considered alternatives to termination of parental rights, including exploring David's mother and Ann's maternal aunt, V.H., as alternative placements for Ann. As noted, David's mother was ruled out due to a prior Division history and for testing positive for marijuana, and Ann's maternal aunt was ruled out for testing positive for marijuana. The Division placed Ann with another family member, Clara, who proved to be an able and caring resource parent. She has provided Ann with a safe and secure home, and she wishes to adopt the child.

David argues the court erroneously concluded David can be properly distinguished from the defendant in R.G. based on its finding David missed a single visit with Ann when he failed to appear for the visitation arranged at the

31

courthouse. David's incarceration provided challenges to the provision of services, including visitation, but unlike the defendant in R.G., who made consistent efforts to remain in contact with his child, the evidence shows David made no effort to stay in contact with Ann despite the availability of phone contact with a resource parent who was a family member, and that David chose not to visit with Ann when visitation was made available by the court.

In sum, based on the evidence presented, we are convinced the Division clearly and convincingly proved it made reasonable efforts to provide the services necessary to support David's reunification with Ann. Further, reunification was not a viable option because Dr. Jeffrey's testimony unequivocally established reunification with David will cause Ann harm and, due to the nature and extent of his psychological issues, he will be unable in the foreseeable future to safely parent Ann. See A.W., 103 N.J. at 605 (explaining reunification is not an option when it could cause harm to the child).

## D.

The fourth prong of the best interests of the child standard requires the Division establish "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parent, but

it is based "'on the paramount need the children have for permanent and defined parent-child relationships.'" K.H.O., 161 N.J. at 355 (quoting J.C., 129 N.J. at 26). Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid.

Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "[T]he question to be addressed under [prong four] is whether, after considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with [their] natural parents than from permanent disruption of [their] relationship with [their] foster parents." I.S., 202 N.J. at 181 (quoting J.N.H., 172 N.J. at 478). Generally, to prove the fourth prong, the Division "'should offer testimony of a well[-]qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents.'" F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)).

The record reflects clear and convincing evidence supporting the trial court's conclusion the termination of David's parental rights would not do more harm than good. Considering all of the evidence presented by the Division

A-5488-18T3

relevant to the fourth prong, including the uncontroverted expert testimony, it cannot be said the trial court's conclusion with respect to the fourth prong "'went so wide of the mark that a mistake must have been made.'" M.M., 189 N.J. at 279 (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

## E.

As we have detailed, the record supports the trial court's determination the Division established each prong of the best interests standard by clear and convincing evidence. To the extent we have not already addressed them, any additional arguments made by David lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION